UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LAKHDAR BOUMEDIENE, *et al.*,      )
                                    )
             Petitioners,           )
                                    )
        v.                          )   Civil Case No. 04-1166 (RJL)
                                    )
GEORGE W. BUSH, *et al.*,           )
                                    )
             Respondents.           )

**MEMORANDUM ORDER**
(November 20, 2008)

Petitioners are six prisoners at the U.S. Naval Base at Guantanamo Bay, Cuba and allege that they are being unlawfully detained by Respondents President George W. Bush, Secretary of Defense Robert M. Gates,[1] Army Brigade General Jay Hood, and Army Colonel Nelson J. Cannon (collectively "respondents" or the "Government"). On November 6, 2008, this Court commenced habeas corpus hearings for petitioners Lakhdar Boumediene, Mohamed Nechla, Hadj Boudella, Belkacem Bensayah, Mustafa Ait Idir, and Saber Lahmar (collectively "petitioners" or "detainees"). That morning, counsel for both parties made unclassified opening statements in a public hearing. As a result of certain technical difficulties, the petitioners listened to a tape recording of those

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), if a public officer named as a party to an action in his official capacity ceases to hold office, the court will automatically substitute that officer's successor. Accordingly, the Court substitutes Robert M. Gates for Donald H. Rumsfeld.

arguments the following day and received an Arabic translation of the transcript of the proceeding shortly thereafter.

In the afternoon of November 6th, this Court convened a closed door session with counsel to begin reviewing certain classified evidence being relied upon by both sides in this case. These closed door sessions continued throughout the remaining six days of hearings. On November 12, 2008, the Government rested its case in chief. Petitioners' counsel thereafter put two of the detainees on the stand via video-teleconference from Guantanamo Bay, Cuba. The detainees, Mr. Ait Idir and Mr. Boudella, were questioned by their own counsel and cross-examined by Government counsel. Thereafter, the Government exercised its right to put on a rebuttal case. Its rebuttal focused primarily on evidence relating to Mr. Bensayah.

On November 14, 2008, counsel for petitioners and the Government presented nearly four and a half hours of closing arguments. Once again, because the information discussed in those arguments was overwhelmingly classified, they had to be held in a closed door session. As a result, neither the public nor the petitioners were able to listen to the arguments. At the end of the final arguments, the Court informed the parties that it would hold a public hearing today to announce its decision. A closed hearing will be held hereafter to discuss in greater detail the Court's reasoning based on the classified evidence relevant to these six detainees.

Before stating the Court's ruling, a brief statement of the relevant factual and procedural background of this case is appropriate.

## BACKGROUND

To say the least, this is an unusual case. At the time of their arrest, all six petitioners, who are native Algerians, were residing in Bosnia and Herzegovina (hereinafter "Bosnia"), over a thousand miles away from the battlefield in Afghanistan. (Pet'rs Public Traverse [Dkt. #213] at 1.) Petitioners held Bosnian citizenship or lawful permanent residence, as well as their native Algerian citizenship. (*Id.*) All six men were arrested by Bosnian authorities in October 2001 for their alleged involvement in a plot to bomb the U.S. Embassy in Sarajevo.[2] (*Id.* at 14, 17.) Respondents have since withdrawn that allegation as a basis for the petitioners' detention. (*See* Hr'g Tr. 22:14-23:8, Nov. 6, 2008 (Public Opening Arguments).) On January 17, 2002, upon their release from prison in Sarajevo, petitioners were detained by Bosnian authorities and U.S. personnel. (Pet'rs Public Traverse at 21.) Petitioners were transported to the U.S. Naval Station at Guantanamo Bay and have remained there since their arrival on January 20, 2002. (*Id.* at 21.)

In July 2004, after the Supreme Court's decision in *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (holding that 28 U.S.C. § 2241 extended statutory habeas corpus jurisdiction to Guantanamo), detainees filed, on their own behalf and through certain relatives as their "next friend," a petition for writs of habeas corpus, alleging, among other things, that the U.S. Government holds them in violation of the Constitution and various U.S. and

---

[2] Between October 18 and 21, 2001, Bosnian police took Nechla, Boumediene, Ait Idir, Boudella, and Lahmar into custody. (Pet'rs Public Traverse at 17.) At this time, Bensayah was already in custody for alleged immigration charges. (*Id.* at 14.)

international laws. (*See generally* First Am. Pet.) The Government moved to dismiss this action in October 2004.

In January 2005, this Court granted the Government's motion to dismiss, holding that Guantanamo Bay detainees had no rights that could be vindicated in a habeas corpus proceeding. *See Khalid v. Bush*, 355 F. Supp. 2d 311, 314 (D.D.C. 2005). After intervening Supreme Court precedent and legislation changed the legal landscape in which these petitions were brought,[3] the Supreme Court, on June 12, 2008, reversed this Court and held in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), that Guantanamo detainees are "entitled to the privilege of habeas corpus to challenge the legality of their detention." *Id.* at 2262.

Although the Supreme Court made it clear that the privilege of habeas corpus "entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law,"[4] *id.* at 2266 (quoting *I.N.S. v. St. Cyr*, 533 U.S. 289, 302 (2001)), it left largely to the habeas court's discretion to craft, in the first instance, the framework in which these unique habeas cases would proceed. *Id.* at 2276 (Accommodating the Government's "legitimate interest in protecting sources and methods of intelligence gathering" and "other remaining questions

---

[3] *See, e.g.*, Detainee Treatment Act of 2005 ("DTA"), Pub. L. No. 109-148, 119 Stat. 2680; *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006); Military Commissions Act of 2006 ("MCA"), Pub. L. No. 109-366, 120 Stat 2600.

[4] *See also Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (holding that a "citizen-detainee seeking to challenge his classification as an enemy combatant must receive notice of the factual basis for his classification, and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker").

are within the expertise and competence of the District Court to address in the first instance."). Indeed, the Supreme Court even delegated the decision as to which definition of "enemy combatant" should govern these proceedings. *See id.* at 2271 ("The extent of the showing required of the Government in these cases is a matter to be determined."). Above all, the Supreme Court made it very clear that the detainees were "entitled to a prompt habeas corpus hearing." *Id.* at 2275 (noting that "[w]hile some delay in fashioning new procedures is unavoidable, the costs of delay can no longer be borne by those who are held in custody").

With *Boumediene's* instruction that habeas be "an adaptable remedy," *id.* at 2267, and the admonition in *Hamdi v. Rumsfeld*, 542 U.S. 507, 539 (2004), that the district courts should proceed in a "prudent" and "incremental" fashion in wartime habeas proceedings, this Court held its first status conference with Government and petitioners' counsel on July 24, 2008. During that session, it received invaluable insight into the unique nature of this case and the array of logistical and legal questions that it would need to resolve. Several weeks later, the Court received consolidated briefing on the procedural issues common to all of its Guantanamo habeas cases. On August 21, 2008, the Court held oral argument on those issues. The following day, the Government, pursuant to an earlier order, filed its Amended Factual Return. The Government's Return contained approximately 650 pages of exhibits and a 53-page narrative, setting forth the Government's alleged legal and factual basis for holding the six petitioners as "enemy combatants."

On August 27, 2008, the Court issued its Case Management Order ("CMO"), setting forth the procedural framework for the litigation of these six detainees' habeas petitions. (*See* Case Management Order [Dkt. #142].) Petitioners' counsel, pursuant to the CMO, submitted ten motions seeking discovery from the Government, totaling well over 80 individual requests for documents and/or information. The Court held over 50 hours of hearings to address and resolve the various discovery requests. Petitioners' counsel was successful in a number of instances, and the Court ordered the Government to produce additional non-exculpatory information in response to petitioners' requests. As a result of the breadth and complexity of the legal issues presented in this case, the Court had to twice reschedule both the deadline for the petitioners' Traverse and the start date of the habeas corpus hearings.

On October 17, 2008, petitioners' counsel filed the factual portion of their Traverse, setting forth their factual bases for opposing the Government's Return. Petitioners' Traverse included approximately 1,650 pages of exhibits and over 200 pages of narrative, discussing the alleged deficiencies in the Government's case. Three days later, petitioners' counsel submitted the legal portion of their Traverse, setting forth their legal arguments in opposition to the Government's Return.

On October 23, 2008, the Court heard oral arguments from the parties regarding the appropriate definition of "enemy combatant" to be employed in these hearings. Four days later, the Court issued a Memorandum Order, adopting the definition, which had been drafted by the Department of Defense in 2004 for the type of Combatant Status

Review Tribunal ("CSRT") proceedings that these detainees were given. (*See* Mem. Order [Dkt. #237].)

Finally, in the weeks leading up to these hearings, the Court met on a number of occasions with counsel for both parties in an effort to narrow the focus of these hearings to the material issues of fact in dispute between the parties. (*See* Govt's Response re: Fact Issues, filed through the Court Security Office ("CSO") on Nov. 2, 2008 (notice of filing at [Dkt. #248]); Pet'rs Response re: Fact Issues, filed through the CSO on Nov. 3, 2008.) Based on a careful review of the Amended Factual Return and Traverse, and after hearing arguments over the seven days of habeas hearings on the factual issues in dispute, the following is the Court's ruling on the six detainees' petitions.

## LEGAL STANDARD

Under the CMO, the Government bears the burden of proving "by a preponderance of the evidence, the lawfulness of the petitioner's detention." (CMO at 3.) The Government argues that petitioners are lawfully detained because they are "enemy combatants," who can be held pursuant to the Authorization for the Use of Military Force and the President's powers as Commander in Chief.[5] (*See* Unclassified Am. Factual

---

[5] In response to the September 11th terrorist attacks, Congress passed a joint resolution authorizing the President to:
> [U]se all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons.

Authorization for Use of Military Force, Pub. L. No. 107-40, §§ 1-2, 115 Stat. 224 (Sept. 18, 2001).

Return; Resp's Concise Stmt. of Definition of "Enemy Combatant" [Dkt. #170] at 1; Govt's Brief Stmt. of the Legal Basis for Detention of Pet'rs, filed through the CSO on Sep. 3, 2008 (notice of filing at [Dkt. #153]).) The following definition of "enemy combatant" governs the proceedings in this case:

> An "enemy combatant" is an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces.

*Boumediene v. Bush*, 2008 WL 4722127, at *2 (Oct. 27, 2008 D.D.C.). Accordingly, the question before this Court is whether the Government has shown by a preponderance of the evidence that each petitioner is being lawfully detained—*i.e.*, that each is an "enemy combatant" under the definition adopted by this Court.

## ANALYSIS

The Government sets forth two theories as to why these men should be lawfully detained as enemy combatants. First, as to all six petitioners, the Government contends that they planned to travel to Afghanistan in late 2001 and take up arms against U.S. and allied forces. (*See* Unclassified Am. Factual Return Narr. at 21, 28, 36, 39, 44, and 46; Hr'g Tr. 18:12, Nov. 6, 2008 (Public Opening Arguments).) Additionally, as to Belkacem Bensayah alone, the Government contends that he is an al-Qaida member and facilitator.[6] (*See* Unclassified Am. Factual Return Narr. at 21; Hr'g Tr. 18:13-14, Nov. 6,

---

[6] In its Amended Factual Return, the Government initially alleged that Bensayah is an al-Qaida member, facilitator, *and financier*. (Unclassified Am. Factual Return Narr. at ¶ 36.)

2008 (Public Opening Arguments).) The Court will address each of these theories in turn.

## I. The Plan to Travel to Afghanistan to Engage U.S. and Allied Forces

The Government alleges that all six petitioners planned to travel to Afghanistan to take up arms against U.S. and allied forces and that such conduct constitutes "support" of al-Qaida under the "enemy combatant" definition adopted by this Court. (Hr'g Tr. 17:23-18:5, 18:12-20, Nov. 6, 2008 (Public Opening Arguments).) Petitioners disagree. Petitioners contend that the Government has not shown by a preponderance of the evidence that any of the petitioners planned to travel to Afghanistan to engage U.S. forces, and, even if the Government *had* shown that petitioners had such a plan, a *mere plan*, unaccompanied by any concrete acts, is not—as a matter of law—"supporting" al-Qaida within the meaning of the Court's definition of "enemy combatant." (*Id.* at 30:9-20.) For the following reasons, the Court finds that the Government has failed to show by a preponderance of the evidence that any of the petitioners, other than Mr. Bensayah, either had, or committed to, such a plan.

To support its claim that petitioners had a plan to travel to Afghanistan to engage U.S. and allied forces, the Government relies exclusively on the information contained in a classified document from an unnamed source. This source is the only evidence in the

---

However, during the habeas hearings, the Government did not advance the theory that Bensayah was an al-Qaida *financier*. Instead, respondents focused primarily on the allegation that Bensayah is an al-Qaida facilitator. (Hr'g Tr. 18:13-14, Nov. 6, 2008 (Public Opening Arguments).) Accordingly, the Court will focus its analysis with respect to Bensayah on his role as an al-Qaida facilitator.

record directly supporting each detainee's alleged knowledge of, or commitment to, this supposed plan. And while the Government has provided some information about the source's credibility and reliability, it has not provided the Court with enough information to adequately evaluate the credibility and reliability of this source's information. *See Parhat v. Gates*, 532 F.3d 834, 847 (D.C. Cir. 2008) ("[T]he factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty."). For example, the Court has no knowledge as to the circumstances under which the source obtained the information as to each petitioner's alleged knowledge and intentions.

In addition, the Court was not provided with adequate corroborating evidence that these petitioners knew of and were committed to such a plan. *Contra Parhat*, 532 F.3d at 849 (noting, in the Detainee Treatment Act context, that when assessing hearsay evidence in intelligence documents, "we do *not* suggest that hearsay evidence is never reliable – only that it must be presented in a form, or with sufficient additional information, that permits [the factfinder] to assess its reliability"). Because I cannot, on the record before me, adequately assess the credibility and reliability of the *sole* source information relied upon, for five of the petitioners, to prove an alleged plan by them to travel to Afghanistan to engage U.S. and coalition forces, the Government has failed to carry its burden with respect to these petitioners. Unfortunately, due to the classified nature of the Government's evidence, I cannot be more specific about the deficiencies of the Government's case at this time.

Suffice it to say, however, that while the information in the classified intelligence report, relating to the credibility and reliability of the source, was undoubtedly sufficient for the intelligence purposes for which it was prepared, it is *not* sufficient for the purposes for which a habeas court must now evaluate it. To allow enemy combatancy to rest on so *thin* a reed would be inconsistent with this Court's obligation under the Supreme Court's decision in *Hamdi* to protect petitioners from the risk of erroneous detention. *Hamdi*, 542 U.S. at 530.

Having concluded that the Government has not met its burden with respect to the *existence* of a plan to travel to Afghanistan to engage U.S. and coalition forces by these five petitioners, the Court need not address the issue of whether commitment to such a plan would be enough, as a matter of law, to constitute "support" under the Court's definition of "enemy combatant." Thus, because the Government has failed to establish by a preponderance of the evidence the plan that is the *exclusive* basis for the Government's claim that Messrs. Boumediene, Nechla, Boudella, Ait Idir, and Lahmar are enemy combatants, the Court must, and will, grant their petitions and order their release.

## II. Belkacem Bensayah's Role as an al-Qaida Facilitator

As to Mr. Bensayah, however, the Government has met its burden by providing additional evidence that sufficiently corroborates its allegations from this unnamed source that Bensayah is an al-Qaida facilitator. The Government contends that Mr. Bensayah planned to go to Afghanistan to both take up arms against U.S. and allied

11

forces and to facilitate the travel of unnamed others to Afghanistan and elsewhere. In order to establish Bensayah's role as an al-Qaida facilitator, the Government depends on the same intelligence information described above, but also puts forth a series of other intelligence reports based on a variety of sources and evidence, which it contends corroborate the facilitator allegation. I agree.

Although the Court is once again restrained in its ability to discuss and analyze the classified information relied upon by the Government, the Court can describe the information in general terms. The Government provides credible and reliable evidence linking Mr. Bensayah to al-Qaida and, more specifically, to a senior al-Qaida facilitator. The Government additionally provides credible and reliable evidence demonstrating Mr. Bensayah's skills and abilities to travel between and among countries using false passports in multiple names. Finally, the Government creates sufficient doubt as to Bensayah's credibility that his proffered explanations in response to the Government's allegations should not, in this Court's judgment, be credited.

For all of those reasons and more, the Court concludes that the Government has established by a preponderance of the evidence that it is more likely than not Mr. Bensayah not only planned to take up arms against the United States but also facilitate the travel of unnamed others to do the same. There can be no question that facilitating the travel of others to join the fight against the United States in Afghanistan constitutes direct support to al-Qaida in furtherance of its objectives and that this amounts to "support" within the meaning of the "enemy combatant" definition governing this case.

The Court accordingly holds that Belkacem Bensayah is being lawfully detained by the Government as an enemy combatant. As such, the Court must, and will, deny Bensayah's petition for writ of habeas corpus and will *not* order his release.

## CONCLUSION

For all the foregoing reasons, and for the reasons set forth on the record at the closed hearing held on this day, it is, this 20th, day of November, 2008, hereby

**ORDERED** that Petitioner Belkacem Bensayah's petition for writ of habeas corpus is **DENIED**, and it is further

**ORDERED** that Petitioner Lakhdar Boumediene's petition for writ of habeas corpus is **GRANTED**, and it is further

**ORDERED** that Petitioner Mohamed Nechla's petition for writ of habeas corpus is **GRANTED**, and it is further

**ORDERED** that Petitioner Hadj Boudella's petition for writ of habeas corpus is **GRANTED**, and it is further

**ORDERED** that Petitioner Mustafa Ait Idir's petition for writ of habeas corpus is **GRANTED**, and it is further

**ORDERED** that Petitioner Saber Lahmar's petition for writ of habeas corpus is **GRANTED**, and it is further

**ORDERED** that Respondents are directed to take all necessary and appropriate diplomatic steps to facilitate the release of Petitioners Lakhdar Boumediene, Mohamed Nechla, Hadj Boudella, Mustafa Ait Idir, and Saber Lahmar forthwith.

**SO ORDERED.**

_____
RICHARD J. LEON
United States District Judge